UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ x
ERNESTO RODRIGUEZ,

               Plaintiff,

                               FIRST AMENDED COMPLAINT
-against-                         16 Civ. 744

CITY OF NEW YORK, NYPD OFFICER
ALEJANDRO RIVAS, Shield # 7139, NYPD     Jury Trial Demanded
SERGEANT FREDY CRUZ, Shield # 887,
NYPD OFFICER FELIX ACOSTA, Shield No.
11482, NYPD OFFICER DANNY GUZMAN,
Shield No. 6312, NYPD OFFICER BRENDAN
REGAN, Shield No. 29010, and JOHN DOE
NYPD OFFICERS 1-4,

               Defendants.
------------------------------------------------------------ x

       This is an action to recover money damages arising out of the violation of Plaintiff Ernesto Rodriguez's ("Mr. Rodriguez") rights under the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

## JURISDICTION AND VENUE

       1.      This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

       2.      The Court's jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343.

       3.      Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) as the claim arose in the District.

## JURY DEMAND

       4.      Mr. Rodriguez respectfully demands a trial by jury of all issues in the matter pursuant to Federal Rule of Civil Procedure ("FRCP") 38.

## PARTIES

       5.      Mr. Rodriguez lives in New York County and the incident giving rise to this case

occurred in New York County.

6. Defendant City of New York was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.

7. Defendant CITY OF NEW YORK maintains the New York City Police Department ("NYPD"), a duly authorized public authority and/or police department, authorized to perform all functions of a police department as per the applicable sections of the aforementioned municipal corporation, the City of New York.

8. That at all times hereinafter mentioned, Defendants Police Officer Alejandro Rivas, Shield # 7319, Police Sergeant Fredy Cruz, Shield # 887, Police Officer Felix Acosta, Shield No. 11482, Police Officer Danny Guzman, Shield No. 6312, Police Officer Brendan Regan, Shield No. 29010, and John Doe Police Officers 1-2 ("Doe Officer Defendants") were duly sworn police officers of the NYPD and were acting under the supervision of said department and according to their official duties.

9. That at all times hereinafter mentioned the Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

10. Each and all of the acts of the Individual Defendants alleged herein were committed by said Defendants while acting within the scope of their employment by Defendant City of New York.

## FACTS

11. On or about May 23, 2013, Mr. Rodriguez was walking to his home at 2040 Amsterdam Avenue from the hospital where he had a doctor's visit relating to a chronic medical issue.

12.     At the time, Defendant Sergeant Cruz, Defendant Officer Guzman and Defendant Officer Regan were sitting in an unmarked car in plain clothes at 2040 Amsterdam.  It is not entirely clear why these Defendants were there, but they appear to have been part of a drug-bust operation taking place at the nearby corner of Amsterdam Avenue and St. Nicholas Avenue.  On information and belief, Defendant Cruz, Defendant Guzman and Defendant Regan positioned themselves around the corner from a narcotics-sale hotspot being watched by other officers so that they could arrest suspects as they left that scene without interrupting the ongoing surveillance operation.

13.     As Mr. Rodriguez walked home, he passed the corner of Amsterdam Avenue and St. Nicholas Avenue.  He did not know it at the time, but this was the focal point of the aforementioned ongoing surveillance operation.  Defendant Officer Acosta was surveilling that corner in connection with the drug-bust operation and, according to Defendant Officer Acosta, he witnessed a man named J.R. sell narcotics on that corner at about the same time that Mr. Rodriguez happened to pass.

14.     Defendants have not alleged that Mr. Rodriguez was involved in the purported J.R. narcotics sale.

15.     However, when Defendant Officer Acosta saw Mr. Rodriguez walking by, Defendant Officer Acosta claimed to recognize Mr. Rodriguez.  According to Defendant Officer Acosta, on May 9, 2013, he saw Mr. Rodriguez sell cocaine to a John Doe Buyer.

16.     According to Defendants, on May 9, 2013, they arrested John Doe Buyer.

17.     According to Defendants, on May 9, 2013, they did not arrest John Doe Seller.

18.     On information and belief, on May 9, 2013, Defendant Sergeant Cruz and Defendant Officer Rivas were working alongside Defendant Officer Acosta and also witnessed

the alleged narcotics sale.  (They later made representations which either directly confirm or permit that inference in Mr. Rodriguez's Criminal Complaint.)

19.     Returning to May 23, 2013, the day that Defendants unlawfully arrested Mr. Rodriguez for a narcotics offense that had occurred two weeks prior, Defendant Officer Acosta radioed to Defendant Sergeant Cruz, Defendant Officer Regan and Defendant Officer Guzman to arrest J.R. and Mr. Rodriguez, both of whom were walking their way.  Defendant Officer Acosta described their clothing.

20.     Defendants do not allege that J.R. and Mr. Rodriguez appeared to be affiliated with one another as they were watched walking in the same direction.  In fact, Individual Defendants made subsequent statements that J.R. and Mr. Rodriguez did not interact with each other at all.

21.     On arriving at 2040 Amsterdam Avenue, where he lived, Mr. Rodriguez opened the door to go inside.  J.R. moved to enter the building as well.

22.     On information and belief, the Individual Defendants who approached were Defendant Sergeant Cruz, Defendant Officer Guzman and Defendant Officer Regan.

23.     Despite the fact that Defendant Sergeant Cruz had been present at the May 9, 2013 narcotics sale, Defendant Sergeant Cruz did not recognize Mr. Rodriguez as the John Doe Seller and only arrested him on the basis of Defendant Officer Acosta's radio description of Mr. Rodriguez's clothes.

24.     Although it is not clear whether Defendant Officer Guzman witnessed the May 9, 2013 narcotics sale, he claimed to recognize Mr. Rodriguez as a person who was the subject of an open criminal complaint.

25.     Despite the fact that Defendant Sergeant Cruz, Defendant Officer Guzman and Defendant Officer Regan were all at the scene, these Individual Defendants made subsequent,

conflicting statements about what occurred during the arrest.  Defendant Sergeant Cruz stated that he arrested Mr. Rodriguez alone while Defendant Officer Guzman and Defendant Officer Regan tended to J.R..  Defendant Officer Regan stated that he arrested J.R. but that he could not remember the scene of the arrest, who else was there and specifically did not remember Defendant Officer Guzman being with him.

26. According to Mr. Rodriguez, Individual Defendants appeared uncertain if he was one of the people for whom they had been on the lookout.  One of the Individual Defendants said about Mr. Rodriguez, in sum and substance, "Is it him?"  On information and belief this was Defendant Officer Guzman, though it may have been Defendant Sergeant Cruz.  A second Individual Defendant—on information and belief, this was Defendant Sergeant Cruz—indicated that he thought that Mr. Rodriguez was "maybe him."  On information and belief, it was Defendant Officer Guzman who warily responded "Are you sure?"

27. It is unclear whether Defendant Officer Regan participated directly in Mr. Rodriguez's arrest.  However, Defendant Officer Regan was on the scene and failed to intervene despite apparent uncertainty about Mr. Rodriguez being the correct suspect.  This was unreasonable in light of the fact that Individual Defendants later claimed to have known Mr. Rodriguez well from their neighborhood patrols, in light of the fact that Defendant Officer Guzman reportedly recognized Mr. Rodriguez as the subject of an open complaint yet did not seem confident about his identity, and in light of the fact that Defendant Officer Acosta only described Mr. Rodriguez by his clothes and not by his purportedly well-known name.

28. No Individual Defendant asked for Mr. Rodriguez's identification at the scene and took him to the 33rd Precinct without asking his name, despite their confusion about who he was and despite the fact that Individual Defendants later claimed that Mr. Rodriguez was well known to them from neighborhood patrols.

29. It was not until much later at the precinct that anyone asked Mr. Rodriguez for his identification.

30. One of the Individual Defendants told Mr. Rodriguez that they were going to give him a summons at the precinct for disorderly conduct.

31. Mr. Rodriguez could not imagine why he would be charged for disorderly conduct as he had just come from the hospital and he had done nothing out of the ordinary.

32. Mr. Rodriguez was incarcerated and the next day taken to Central Booking, where he was charged with a single charge of sale of a controlled substance. It was at this time that Mr. Rodriguez first learned that his arrest related to an incident which occurred on May 9, 2013, roughly two weeks prior to Mr. Rodriguez's arrest.

33. Defendant Officer Acosta swore out a Criminal Complaint against Mr. Rodriguez stating that Defendant Officer Rivas had told Defendant Officer Acosta that on May 9, 2013, Mr. Rodriguez sold cocaine. Not only is this not true, it is unclear why Defendant Officer Acosta had to rely upon Defendant Officer Rivas's representation in this regard when Defendant Officer Acosta is the person who allegedly unexpectedly recognized Mr. Rodriguez during Defendant Officer Acosta's surveillance of the Amsterdam/St. Nicholas corner.

34. In that same Criminal Complaint, Defendant Officer Acosta stated that Defendant Sergeant Cruz represented to him that Defendant Sergeant Cruz had been involved in the May 9, 2013 incident and had recovered cocaine from John Doe Buyer upon John Doe Buyer's arrest.

35. None of what Individual Defendants represented to employees of the District Attorney's Office was true and no reasonable person would have mistaken the jumble of facts of which Individual Defendants were aware as establishing probable cause to believe that Mr. Rodriguez, who had just been swept up at random in a sting, had been involved in the alleged May 9, 2013 narcotics sale.

36. In reliance upon Individual Defendants' individual and collective fabrication of evidence and failure to intervene to correct those fabrications, the DA's Office charged Mr. Rodriguez with criminal sale of narcotics.

37. Mr. Rodriguez was unlawfully incarcerated roughly 24 hours as a consequence of Defendants' violation of his rights.

38. Mr. Rodriguez's medical condition requires him to eat from a very specific and limited list of foods five times a day in order to keep stable. During his 24-hour incarceration, Mr. Rodriguez was unable to follow this regimen. Mr. Rodriguez alerted supervising police officers, some of whom on information and belief were Individual Defendants, likely Defendant Sergeant Cruz and/or Defendant Officer Acosta, about this serious medical need for alimentary accommodation. Mr. Rodriguez demonstrated the truth of this need by showing Individual Defendants bruises on his body stemming from treatment. Mr. Rodriguez also had medical paperwork on his person because he was coming from the hospital when Defendants falsely arrested him, and Mr. Rodriguez showed the paperwork to Individual Defendants. Mr. Rodriguez received no alimentary accommodation for this serious medical need.

39. After Mr. Rodriguez was released and when he returned to the precinct to recover his vouchered property, a Doe Officer gave Mr. Rodriguez a related sheet of paper relating to the vouchered property.

40. The name "Jonathan" and a last name appeared on the sheet of paper (Mr. Rodriguez recollects that Jonathan was the first name, although he may be mistaken) and Mr. Rodriguez asked "Who is Jonathan?"

41. On hearing Mr. Rodriguez's question, the Doe Officer snatched the voucher receipt from Mr. Rodriguez's hand, ripped off the part that said "Jonathan," returned the balance of the page to Mr. Rodriguez, and stated: "You were not supposed to see that."

42.     Within roughly one to two days after Mr. Rodriguez's release, he returned to see a doctor for examination and treatment as a result of his incarceration. Mr. Rodriguez's medical condition requires him to eat from a very specific and limited list of foods five times a day in order to keep stable. During his incarceration, Mr. Rodriguez was unable to follow this regimen and he suffered ill physical effects, pain and discomfort as a result.

43.     Approximately two weeks after Mr. Rodriguez's release, before his next court date and without having to reappear in court, Mr. Rodriguez received a letter in the mail indicating that the charge brought against him had been dismissed on the District Attorney's Office's motion.

44.     Mr. Rodriguez filed a CCRB complaint against Defendants, which complaint was processed as being levied solely against Defendant Sergeant Cruz. Although Mr. Rodriguez did not know Defendants by name during his arrest, it was through the CCRB proceedings that he was able to attempt to piece together which Defendant committed which act as herein described.

45.     Defendants unconstitutionally deprived Mr. Rodriguez of his liberty, caused him physical injury, damaged his reputation, caused him emotional distress and fear that manifested in physical ailments and more. Mr. Rodriguez continues to suffer these damages.

46.     The damage to Mr. Rodriguez's reputation is shown by, among other things, the fact that his uncle walked past as Mr. Rodriguez was being seized and searched at the Amsterdam Avenue apartment.

47.     All of the above occurred as a direct result of the unconstitutional policies, customs or practices of the City of New York, including, without limitation, the inadequate screening, hiring, retaining, training and supervising of its employees, and due to a custom, policy and/or practice of: arresting innocent persons in order to meet "productivity goals," or arrest quotas; arresting individuals for professional advancement, overtime compensation, and/or

other objectives outside the ends of justice; and/or manufacturing false evidence against individuals in an individual effort and also in a conspiracy to justify their abuse of authority in falsely arresting those individuals.

48. The aforesaid incident is not an isolated incident. The existence of the aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct as documented in civil rights actions filed in the United States District Courts in the Eastern and Southern Districts of New York as well as in New York State courts. As a result, Defendant City of New York is aware (from said lawsuits as well as notices of claims and complaints filed with the NYPD's Internal Affairs Bureau and the CCRB) that many NYPD officers, including the Individual Defendants, arrest individual persons in order to meet productivity goals and arrest quotas; arrest individuals for professional advancement, overtime compensation and/or other objectives outside the ends of justice; and/or falsely arrest individuals and engage in a practice of falsification of evidence in an attempt to justify the false arrest.

49. The Honorable Jack B. Weinstein, United States District Judge for the Eastern District of New York, has written that

> [i]nformal inquiry by the [C]ourt and among judges of this [C]ourt, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the [NYPD] . . . [T]here is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the [C]ity approving illegal conduct of the kind now charged.

Colon v. City of N.Y., No. 09 Civ. 8, No. 09 Civ. 9 (JBW), 2009 WL 4263363, at *2 (E.D.N.Y. Nov. 25, 2009).

50. Former Deputy Commissioner Paul J. Browne, as reported in the press on January 20, 2006, stated that NYPD commanders are permitted to set "productivity goals," permitting an

9

inference of such a custom or policy encouraging deprivations of individuals' constitutional rights in cases such as this one.

51. Defendant City of New York is thus aware that its improper training and customs and policies have often resulted in a deprivation of individuals' constitutional rights. Despite such notice, Defendant City of New York has failed to take corrective action. This failure caused Individual Defendants in this case to violate Mr. Rodriguez's constitutional rights.

52. Moreover, on information and belief, Defendant City of New York was aware, prior to the incident, that the Individual Defendants lacked the objectivity, temperament, maturity, discretion and disposition to be employed as police officers. Despite such notice, Defendant City of New York has retained these officers, and failed to adequately train and supervise them.

53. All of the aforementioned acts of Defendants, their agents, servants and employees were carried out under color of state law.

54. All of the aforementioned acts deprived Mr. Rodriguez of the rights, privileges and immunities guaranteed to citizens of the United States by the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and in violation of 42 U.S.C. § 1983.

55. The acts complained of were carried out by the aforementioned Individual Defendants in their capacities as police officers, with the entire actual and/or apparent authority attendant thereto.

56. The acts complained of were carried out by the aforementioned Individual Defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures and the rules of the Defendant City of New York and the NYPD, all under the supervision of ranking officers of said department.

57. Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

58. As a result of the foregoing, Mr. Rodriguez is entitled to compensatory and punitive damages in an amount to be fixed by a jury, plus reasonable attorneys' fees, costs and disbursements of this action.

## FIRST CLAIM
## 42 U.S.C. § 1983

59. Mr. Rodriguez repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

60. Defendants, by their conduct toward Mr. Rodriguez alleged herein, violated Mr. Rodriguez's rights guaranteed by 42 U.S.C. § 1983 and the Fourth, Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States.

61. Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly with malice and with the specific intent to deprive Mr. Rodriguez of his constitutional rights.

62. As a direct and proximate result of Defendants' unlawful conduct, Mr. Rodriguez sustained the damages hereinbefore alleged.

## SECOND AND THIRD CLAIMS
## FALSE ARREST AND MALICIOUS PROSECUTION

63. Mr. Rodriguez repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

64. Defendants violated the Fourth, Fifth and Fourteenth Amendments because they arrested, searched and incarcerated Mr. Rodriguez without probable cause.

65. Defendants then caused the commencement of a criminal proceeding against Mr. Rodriguez and continued that proceeding despite the lack of probable cause.

66. That prosecution ultimately terminated in Mr. Rodriguez's favor when the state court dismissed all charges against him.

67. Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Mr. Rodriguez of his constitutional rights.

68. As a direct and proximate result of Defendants' unlawful conduct, Mr. Rodriguez sustained the damages hereinbefore alleged.

## FOURTH AND FIFTH CLAIMS
## FABRICATION OF EVIDENCE AND DENIAL OF A FAIR TRIAL

69. Mr. Rodriguez repeats and re-alleges each of the preceding allegations in this Complaint with the same force and effect as if fully set forth herein.

70. Defendants, by their conduct toward Mr. Rodriguez herein alleged, fabricated evidence against Mr. Rodriguez knowing that the evidence in question would likely influence a grand jury and trial jury. This evidence fabrication corrupted Mr. Rodriguez's fair trial rights as guaranteed by 42 U.S.C. § 1983, the Sixth and the Fourteenth Amendments to the Constitution of the United States.

71. Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Mr. Rodriguez of his constitutional rights.

## SIXTH CLAIM
## FAILURE TO INTERVENE

72. Mr. Rodriguez repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

73. The Individual Defendants actively participated in the aforementioned unlawful conduct and observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

74. Accordingly, the Individual Defendants who failed to intervene violated the Fourth, Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

75. Individual Defendants' unlawful actions, which were committed under color of state law, were done willfully, knowingly, with malice and with the specific intent to deprive Mr, Rodriguez of his constitutional rights.

76. As a direct and proximate result of Defendants' unlawful conduct, Mr. Rodriguez sustained the damages hereinbefore alleged.

## SEVENTH CLAIM
## MONELL

77. Mr. Rodriguez repeats and re-alleges each of the preceding allegations contained in this Complaint with the same force and effect as if fully set forth herein.

78. Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the United States Constitution.

79. The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYPD included, but were not limited to, the inadequate screening, hiring, retaining, training and supervising of its employees that was the moving force behind the violation of Mr. Rodriguez's rights as described herein. As a result of the failure of the Defendant City of New York to properly recruit, screen, train, discipline and supervise its officers, including the Individual Defendants, Defendant City of New York has tacitly authorized, ratified and has been deliberately indifferent to, the acts and conduct complained of herein.

13

80. The aforementioned customs, policies, usages, practices, procedures and rules of Defendant City of New York and the NYPD included, but were not limited to: arresting innocent persons in order to meet "productivity goals," or arrest quotas; arresting individuals for professional advancement, overtime compensation, and/or other objectives outside the ends of justice; and/or manufacturing false evidence against individuals in an individual effort and also in a conspiracy to justify their abuse of authority in falsely arresting, unlawfully stopping and maliciously prosecuting those individuals.

81. The foregoing customs, policies, usages, practices, procedures and rules of the Defendant City of New York and the NYPD constituted deliberate indifference to Mr. Rodriguez's safety, well-being and constitutional rights.

82. The foregoing customs, polices, usages, practices, procedures and rules of Defendant City of New York and the NYPD were the direct and proximate cause of the constitutional violations suffered by Mr. Rodriguez as described herein.

**PRAYER FOR RELIEF WHEREFORE**, Mr. Rodriguez respectfully requests the following relief:

A. An order entering judgment for Mr. Rodriguez against Defendants on each of their claims for relief;

B. Awards to Mr. Rodriguez for compensatory damages against all Defendants, jointly and severally, for their violation of Mr. Rodriguez's Fourth, Fifth, Sixth and Fourteenth Amendment rights, the amount to be determined at jury trial, which Mr. Rodriguez respectfully demands pursuant to FRCP 38;

C. Awards to Mr. Rodriguez of punitive damages against Defendants on the basis of their conscious wrongdoing and callous indifference to Mr. Rodriguez's constitutional rights

and welfare, the amount to be determined at jury trial, which Mr. Rodriguez respectfully demands pursuant to FRCP 38;

  D. Awards to Mr. Rodriguez of the costs of this action, including reasonable attorneys' fees;

  E. Such further relief as this Court deems just and proper.

DATED:  May 4, 2016
      New York, New York

                /s
              Ryan Lozar (RL0229)
              305 Broadway, 9th Floor
              New York, New York 10007
              (310) 867-1562

              *Attorney for Plaintiff*