UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                                      :
ERNESTO RODRIGUEZ,                                    :
                                                      :
                                    Plaintiff,        :
                                                      :
                        v.                            :      16 Civ. 744 (KPF)
                                                      :
CITY OF NEW YORK, NYPD OFFICER                        :      OPINION AND ORDER
ALEJANDRO RIVAS, Shield No. 7139,                     :
NYPD SERGEANT FREDY CRUZ, Shield                      :
No. 887, NYPD OFFICER FELIX ACOSTA,                   :
Shield No. 11482, NYPD OFFICER DANNY                  :
GUZMAN, Shield No. 6312, NYPD OFFICER                 :
BRENDAN REGAN, Shield  No. 29010,                     :
                                                      :
                                    Defendants.       :
                                                      :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>March 5, 2018</u>

KATHERINE POLK FAILLA, District Judge[1]:

        On May 23, 2013, Plaintiff Ernesto Rodriguez was arrested and charged

with a narcotics offense that was alleged to have occurred two weeks earlier, on

May 9, 2013.  After prosecutors dismissed the charges, Plaintiff brought claims

against Sergeant Fredy Cruz and Officers Alejandro Rivas, Felix Acosta, Danny

Guzman, and Brendan Regan (the "Officers") of the New York City Police

Department ("NYPD"), as well as the City of New York (collectively,

"Defendants"), under 42 U.S.C. § 1983 for false arrest, malicious prosecution,

fabrication of evidence and denial of a fair trial, failure to intervene, and

municipal liability.  Defendants have moved for partial summary judgment,

---

[1]        The Clerk of Court is directed to revise the case caption as set forth above.

and, for the reasons that follow, the motion is granted in part and denied in part.

**BACKGROUND**[2]

**A.    Factual Background**

**1.    Events of May 9, 2013**

On May 9, 2013, Defendants Felix Acosta and Alejandro Rivas — then NYPD officers assigned to the 33rd Precinct — were part of a Street Narcotics Enforcement Unit ("SNEU") team.  (Pl. 56.1 Opp. ¶ 1).  By way of background, SNEU teams operate in two groups: an "observation team" and a "catch team." (*See id.* at ¶¶ 1, 33-34; Cruz Dep. 24:9-25:15).  The observation team consists of at least two officers who observe an area from a location, typically the roof of a building, while the catch team is assigned to a car on the street.  (Cruz Dep. 24:9-26:24).  If the observation team sees a narcotics transaction, they will radio the catch team and provide a physical description of the individuals involved and their "direction of flight."  (*Id.*).  At that point, the catch team will attempt to locate and apprehend the individuals described.  (*Id.*).

---

[2]    The facts in this Opinion are drawn from the parties' submissions in connection with the motion for partial summary judgment, including Defendants' Local Rule 56.1 Statement ("Def. 56.1" (Dkt. #77)), and Plaintiff's Local 56.1 Counterstatement ("Pl. 56.1 Opp." (Dkt. #80)).  Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.  For convenience, Defendants' memorandum of law will be referred to as "Def. Br." (Dkt. #75); Plaintiff's opposition brief as "Pl. Opp." (Dkt. #79); and Defendants' letter in lieu of a reply brief as "Def. Reply Ltr." (Dkt. #88).  The parties have submitted deposition transcripts for Plaintiff and each of the individual Defendants; each transcript will be referred to using the convention "[Name] Dep."  Finally, the Court refers to the documents submitted with the Declaration of Ryan Lozar using the convention "Lozar Decl., Ex. [ ]."

2

Acosta and Rivas were part of the observation team on May 9, 2013, and were working from an observation post to gain an aerial view of the area surrounding St. Nicholas Avenue between 162nd and 163rd Streets. (Pl. 56.1 Opp. ¶ 2). As an initial matter, Plaintiff impugns Acosta's and Rivas's ability to observe events on the street from their perch atop a 15-story building several blocks away in a "busy urban area" near a school and a subway station and while using equipment of disputed utility. (*Id.* at ¶ 2). But more than that, Plaintiff disputes the entirety of Defendants' account of the events of May 9, 2013. Defendants claim that Acosta "observed what appeared to be a hand-to-hand narcotics transaction" involving several individuals, one of whom he subsequently identified as Plaintiff. (Def. 56.1 ¶¶ 3, 37). Plaintiff contests whether it was Acosta or Rivas who observed this alleged narcotics transaction, and indeed he disputes whether Rivas was even present at the observation post at the time of the alleged transaction. (Pl. 56.1 Opp. ¶¶ 1, 3; *see also id.* at ¶ 3 ("Plaintiff disputes the entirety of Defendants' account of what happened on May 9 and why they connected Plaintiff to that event.")). Instead, Plaintiff claims that Defendants' account of the events of May 9, 2013, is a "fabrication developed by Defendants on May 23[, 2013] in an effort to correct Plaintiff's false arrest[.]" (*Id.* at ¶ 20).

While Plaintiff denies Defendants' account of the May 9, 2013 events, that account is presented here for context. Defendants claim that Acosta, working from his observation post, identified a buyer, a seller, and a third man who interacted with both the buyer and the seller as an intermediary. (Def.

56.1 ¶¶ 4-5, 8-11). "The third man caught [ ] Acosta's attention, in part, because he was standing in the area bouncing a tennis ball," which Acosta knew to be a means of surreptitiously transferring narcotics. (*Id.* at ¶¶ 6-7). Once the alleged sale concluded, Acosta alerted the catch team to what he saw and gave them a description of the buyer. (*Id.* at ¶ 13). The catch team apprehended that buyer and a second buyer, who was alleged to have engaged in a transaction with the same seller that day. (*Id.* at ¶¶ 14-15). One alleged buyer was an individual with the initials B.P.; the other alleged buyer was an individual with the initials E.J.R. (*Id.* at ¶¶ 16-17). The seller and the intermediary, however, were not apprehended. (*Id.* at ¶¶ 18-21).

According to NYPD documents, B.P. was arrested at 4:25 p.m., on May 9, 2013, and was charged with criminal possession of a controlled substance in the seventh degree. (Lozar Decl., Ex. 19, 21). Defendant Officer Danny Guzman is listed as the arresting officer; B.P.'s Arrest ID is M13641930 and his arrest is listed as connected to Complaint Number 2013-033-01874. (*Id.* at Ex. 19). The New York County District Attorney's Office ("DANY") charged B.P. with a misdemeanor offense of cocaine possession; he was given a desk appearance ticket, pleaded guilty, and was sentenced to time served. (*Id.* at Ex. 20-22). B.P.'s DANY Datasheet references an "unapprehended seller," but does not reference an intermediary or even a third individual involved in the transaction. (*Id.* at Ex. 21).

E.J.R. was arrested at 4:40 p.m., on May 9, 2013, and was also charged with criminal possession of a controlled substance in the seventh degree.

(Lozar Decl., Ex. 16). Officer Rivas is listed as the arresting officer; E.J.R.'s Arrest ID is M13641909 and his arrest is listed as connected to Complaint Number 2013-033-01874. (*Id.*). The DANY charged E.J.R. with a misdemeanor offense of cocaine possession and he was given an adjournment in contemplation of dismissal. (*Id.* at Ex. 18). E.J.R.'s DANY Datasheet states: "Dealer being investigated by POs, not arrested today." (*Id.*). The Datasheet makes no mention of an intermediary or third person involved in the sale and only references exchanges between E.J.R. and the dealer. (*Id.*).

The parties agree that on May 9, 2013, Rivas generated an NYPD Omniform System Complaint ("OSC") numbered 2013-033-01874. (Pl. 56.1 Opp. ¶ 23; Lozar Decl., Ex. 15). This is the complaint number referenced in B.P.'s and E.J.R.'s arrest papers. (Lozar Decl., Ex. 16, 19). The OSC lists the location as "Front of 1045 Saint Nicholas Avenue," the time of occurrence as May 9, 2013, at 4:40 p.m., and the statement that "at [time and place of occurrence] deft. was observed in possession of alleged cocaine at above location." (*Id.* at Ex. 15). But the parties disagree about the impetus for the OSC and its connection, if any, to Plaintiff. Defendant contends that the OSC was created "in connection with the alleged activities of the two apprehended buyers and the un-apprehended third man" — whom they now identify as Plaintiff — and was "left 'open' because the third man had not been apprehended." (Def. 56.1 ¶¶ 24-25).[3]

---

[3]    The OSC is often referred to by the officers as the "61" or the "open 61." (*See, e.g.*, Regan Dep. 77:13-19 ("'Open 61,' is when there is an investigation needed for that complaint.")).

Plaintiff disputes the entirety of the alleged May 9, 2013 events, and, by extension, whether the OSC was left open that day. (Pl. 56.1 Opp. ¶¶ 24-25). Plaintiff contends that because the offense on the OSC is criminal possession of a controlled substance and the buyers (possessors) of the alleged narcotics had been arrested and charged, the offense in question had been addressed and there were no individuals remaining at large. (*Id.* at ¶ 25).[4]

## 2.    Events of May 23, 2013

On May 23, 2013, Defendants Acosta and Rivas were again assigned to a SNEU observation team, and Defendants Fredy Cruz, Danny Guzman, and Brendan Regan were assigned to the catch team. (Pl. 56.1 Opp. ¶¶ 30, 33-34). Again, the parties dispute what happened: Defendants contend that Acosta and Rivas were positioned atop a building, while "equipped with binoculars," from which they observed "two men walking toward 2040 Amsterdam Avenue." (Def. 56.1 ¶¶ 32, 36). Acosta radioed down to the catch team that he recognized one of the men as the individual who had bounced a tennis ball during a previous hand-to-hand narcotics transaction and that there was an

---

[4]    The Court ascribes no significance to the fact that the OSC is presently marked as "closed." The version of the OSC in the record post-dates Plaintiff's arrest and does not indicate what its status was between May 9 and May 23, 2013. (*See* Lozar Decl., Ex. 15). The Court similarly places little importance on the Officers' inability during their depositions to point to a marking or indication on the face of the OSC that shows it was left open at the time it was generated. (*See, e.g.*, Cruz Dep. 109:16-24 ("To 61 and it's — no I can't say."); Regan Dep. 80:6 ("It says, 'closed.'"); Guzman Dep. 82:3-5 ("I do not see it on this page.")). The officers were shown the same version that is in the record before the Court — the version that post-dates Plaintiff's arrest and is listed as "closed." Because there is no indication on the document of its status between May 9 and 23, 2013, the fact that the officers could not identify anything on the document showing that it had been left open on May 9, 2013, is consistent more with their obligation to testify truthfully than with Plaintiff's theory of the case. Nonetheless, the Court agrees that there is a genuine dispute as to whether the OSC was left open at the time it was generated on May 9, 2013.

6

open complaint for that individual's arrest. (*Id.* at ¶¶ 38-40). Cruz confirmed the description with Acosta, and the catch team proceeded to apprehend the two men at 2040 Amsterdam Avenue. (*Id.* at ¶¶ 42-46). Cruz and Guzman testified during their respective depositions that they had been informed that the observation team believed that one of the two men was a participant in a May 9, 2013 narcotics transaction that was the subject of an open complaint. (Cruz Dep. 46:2-15 ("Officer Acosta went over the radio and indicated that he[ was] observing an individual that he observed a couple of days ago involving a hand-to-hand as a seller ... [who] was the guy bouncing the ball."); Guzman Dep. 26:19-27:3 ("[The observation team explained t]hat there was an open Complaint for [Plaintiff's] arrest for the sale of narcotics.")).

With particular respect to the events of May 23, 2013, Defendants emphasize that Cruz was the only officer who interacted with Plaintiff, and that Regan and Guzman interacted with the other individual, a man with the initials J.R. (Def. 56.1 ¶¶ 44, 61-62; Regan Dep. 35:7-12; Guzman Dep. 31:5-11). According to NYPD records, J.R. was arrested for criminal possession of marijuana in the fifth degree based on marijuana "recovered from [J.R.'s] crotch area." (Lozar Decl., Ex. 25-26). Guzman was the arresting officer for J.R.; J.R.'s arrest is not listed as being associated with any others or with any open complaint number. (*Id.* at Ex. 25). For its part, Plaintiff's arrest report states that he was arrested for criminal sale of a controlled substance in the third degree based on the allegation that he was observed "exchanging cocaine for U.S. currency from an apprehended buyer" on May 9, 2013. (*Id.* at Ex. 27).

Plaintiff's Arrest ID is M13646592 and his arrest is logged as connected to OSC

2013-033-01874 — the number of the OSC generated on May 9, 2013.  (*Id.*;

*see also id.* at Ex. 15).  There are two arrests listed as associated with

Plaintiff's: Arrest ID M13641909 and Arrest ID M13641930; these are the

arrest numbers, respectively, for alleged buyers E.J.R. and B.P., who were

apprehended on May 9, 2013.  (*Id.* at Ex. 16, 19, 27).

Plaintiff denies Defendants' account of the events on May 23, 2013, and

contends that Plaintiff was "falsely arrested … for being in JR's vicinity when

JR committed a marijuana offense."  (Pl. 56.1 Opp. ¶ 36).  As partial support,

Plaintiff cites certain paperwork generated by the officers upon arrival at the

33rd Precinct.  Cruz acknowledged that he recorded Plaintiff's and J.R.'s

arrests in a command log book.  (Lozar Decl., Ex. 23).  The entry for J.R. states

that Guzman was the arresting officer and that J.R. was charged with "CSM,"

or criminal sale of marijuana, and notes that the arrest "conforms with IO 49-

2011," an NYPD document that relates to charges for marijuana offenses.  (*Id.*;

Cruz Dep. 67:16-68:9).  Plaintiff's arrest entry states that Acosta was the

arresting officer and that he, too, was charged with CSM and that his arrest

also "conforms [with] IO 49-2011."  (Lozar Decl., Ex. 23).[5]

---

[5]     Cruz explained at his deposition that there was "[o]bviously … an error in [Plaintiff's]
charge," because it "should be criminal sale of a controlled substance," and that he
tends to fill out the log entries based on the Prisoner Pedigree Card he receives from the
arresting officer.  (Cruz Dep. 70:4-19; 72:19-24).  In the "Arresting Officer" field of
Plaintiff's Prisoner Pedigree Card, "Guzman, D." is crossed out and "Acosta" is written to
the right on the same line.  (Lozar Decl., Ex. 24).  Further down, in the "Primary
Charge" field "CSM" is crossed out and "CSCS" is written to the right on the same line
followed by "(OPEN 61)."  (*Id.*).

### 3.    Plaintiff's Criminal Charges and Their Dismissal

Ultimately, the DANY charged Plaintiff with criminal sale of a controlled substance in the third degree, in violation of New York Penal Law § 220.39(1). (Lozar Decl., Ex. 30).  The felony complaint alleges that "[o]n or about May 9, 2013 at about 4:21 P.M., in front of 1045 Saint Nicholas Avenue … the defendant knowingly and unlawfully sold a narcotic drug." (*Id.*).  Acosta signed the complaint as deponent, averring in part as follows:

> I am informed by Police Officer Alejandro Rivas, shield #7319 of th[e] 33rd Precinct, that defendant exchanged a quantity of cocaine for United States currency from another apprehended individual.  I am further informed by Sergeant Fredy Cruz, shield #887 of the 33rd Precinct, that he recovered said quantity of cocaine from said other apprehended individual.

(*Id.*).  The DANY Datasheet in Plaintiff's file indicates that the officers observed Plaintiff engage in a narcotics transaction on May 9, 2013, and apprehended Plaintiff in connection with this offense on May 23, 2013.  (*Id.*).

On May 24, 2013, Plaintiff was arraigned and released on his own recognizance.  (Lozar Decl., Ex. 31; Pl. 56.1 Opp. ¶ 56).  His case was adjourned to September 9, 2013.  (Lozar Decl., Ex. 31; Pl. 56.1 Opp. ¶ 57).  On June 14, 2013, the DANY made a motion to dismiss the charges.  (Pl. 56.1 Opp. ¶ 58).  Plaintiff states that he "was not notified of the dismissal; and did not learn about the dismissal until he appeared for his next court date on September 9, 2013." (*Id.*).  Neither the DANY file nor the New York County Criminal Court file contains any information about why the charges against Plaintiff were dismissed.  The June 14, 2013 Record of Court Action bears a

stamp that reads "DISMISSED MOTION A.D.A." with no further information. (Lozar Decl., Ex. 31).

**B.    Procedural Background**

Plaintiff initiated this action on February 1, 2016, and amended his pleadings on May 4, 2016.  (Dkt. #1, 15).  Following an unsuccessful mediation, discovery commenced on October 11, 2016, and concluded on May 10, 2017.  (Dkt. #40, 71).  Defendants moved for partial summary judgment on July 3, 2017.  (Dkt. #74-77).  On August 5, 2017, Plaintiff filed his opposition to Defendants' motion and a letter dismissing certain claims, which letter is discussed in more detail below.  (Dkt. #78-81).  This motion became fully briefed when Defendants submitted a letter in lieu of a reply brief on August 23, 2017.  (Dkt. #88).

## DISCUSSION

Plaintiff's First Amended Complaint raises the following claims against all Defendants: (i) 42 U.S.C. § 1983; (ii) false arrest; (iii) malicious prosecution; (iv) fabrication of evidence; (v) denial of a fair trial; (vi) failure to intervene; and (vii) municipal liability for the City under *Monell* v. *Department of Social Services*, 436 U.S. 658 (1978).  Following the filing of Defendants' motion for partial summary judgment, Plaintiff dismissed his freestanding § 1983 claim in its entirety, and dismissed all claims against the Doe Defendants.  (Dkt. #90).  Plaintiff also dismissed his claims for malicious prosecution, fabrication of evidence, and denial of a fair trial against Sergeant Cruz and Officers Guzman and Regan.  (*Id.*).

As noted, Defendants' motion is one for partial summary judgment. In particular, Defendants have not moved for summary judgment as to Plaintiff's false arrest claim against Officers Acosta and Rivas, and thus the Court will not address the viability of this claim against them in this Opinion. The Court first will address Defendants' motion for summary judgment as to each claim against the affected Officers, and second will address Defendants' motion as to Plaintiff's *Monell* claim against the City for a deprivation of his constitutional rights pursuant to a municipal policy or custom and for a systematic failure to train police officers.

## A.    Applicable Law

### 1.    Motions for Summary Judgment Under Rule 56

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). "It is the movant's burden to show that no genuine factual dispute exists" and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co., Inc.* v. *1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). If the movant

11

has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with 'specific facts showing that there is a *genuine issue for trial.*" *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

Local Civil Rule 56.1 requires that the movant file a "short and concise statement … of the material facts as to which the moving party contends there is no genuine issue to be tried" and each proffered fact will be deemed admitted "unless specifically controverted by a correspondingly numbered paragraph[.]" Local Civ. R. 56.1(a)-(c). Each statement must be supported by a citation to admissible evidence. *Id.* at 56.1(d). But a reviewing court "may not rely solely on the statement of undisputed facts[,] … [i]t must be satisfied that the citation to evidence in the record supports the assertion." *Vt. Teddy Bear Co.*, 373 F.3d at 244 (citing *Giannullo* v. *City. of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2004)). A district court "must ask not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Simpson* v. *City of N.Y.*, 793 F.3d 259, 265 (2d Cir. 2015). It is not appropriate for the Court to make credibility assessments or resolve conflicting versions of the events presented — these are essential questions for a jury. *Id.*

## 2.     Liability under 42 U.S.C. § 1983 and Qualified Immunity

Plaintiff raises claims of false arrest, malicious prosecution, fabrication of evidence, denial of a fair trial, and failure to intervene all under 42 U.S.C. § 1983.  "[Section 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere."  *City of Okla. City* v. *Tuttle*, 471 U.S. 808, 816 (1985).  There are two essential elements to any claim raised under § 1983: "[i] the defendant acted under color of state law; and [ii] as a result of the defendant's actions, the plaintiff suffered a denial of her federal statutory rights, or her constitutional rights or privileges."  *Annis* v. *Cty. of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998).

A valid qualified immunity defense can foreclose liability under § 1983.  "Qualified immunity is an affirmative defense that shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Stephenson* v. *Doe*, 332 F.3d 68, 76 (2d Cir. 2003) (internal quotation marks and citation omitted).  A right is clearly established if "existing law ... placed the constitutionality of the officer's conduct 'beyond debate.'"  *Dist. of Columbia* v. *Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft* v. *al-Kidd*, 563 U.S. 731, 741 (2011)).  Under this standard, "all but the plainly incompetent or those who knowingly violate the law" are protected.  *Id.* (citing *Malley* v. *Briggs*, 475 U.S. 335, 341 (1986)).  "The qualified immunity analysis ... is limited to the facts that were knowable to the defendant officers

at the time they engaged in the conduct in question." *Hernandez* v. *Mesa*, 137 S. Ct. 2003, 2007 (2017) (internal quotation marks omitted).

Courts tend to engage in a two-step process to resolve qualified immunity claims, looking first at whether the plaintiff makes out a violation of a constitutional right, and second, whether the violated right was clearly established at the time of the alleged misconduct. *Pearson* v. *Callahan*, 555 U.S. 223, 232 (2009). But this two-step process need not be applied where it would yield a largely academic analysis with little impact on the outcome of the case — where, for example, it is evident that an alleged right is not clearly established, whether or not it has been violated — and thus the Court need not address both prongs where the latter will suffice. *Id.* at 236.

## B. The Officers' Motion for Partial Summary Judgment Is Granted in Part and Denied in Part

### 1. False Arrest

#### a. Applicable Law

A federal false arrest claim raised under § 1983 is "substantially the same as a claim for false arrest under New York law." *Weyant* v. *Okst*, 101 F.3d 845, 852 (2d Cir. 1996). The elements of false arrest under New York law are: "[i] the defendant intended to confine [plaintiff], [ii] the plaintiff was conscious of the confinement, [iii] the plaintiff did not consent to the confinement, and [iv] the confinement was not otherwise privileged." *Ackerson* v. *City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (internal quotation marks and citation omitted). Probable cause is a complete defense. *Id.* Officers have probable cause to arrest when they have "reasonably trustworthy information

as to facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Id.* (quotation marks and alterations omitted). The central inquiry is thus "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Id.* There need not have been probable cause for the charge stated at the time of arrest; what matters is whether there was probable cause to arrest for any offense. *Id.*

"In the context of § 1983 actions predicated on allegations of false arrest, ... an arresting officer is entitled to qualified immunity so long as 'arguable probable cause' was present when the arrest was made." *Figueroa* v. *Mazza*, 825 F.3d 89, 100 (2d Cir. 2016) (quoting *Zalaski* v. *City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013)). The same is true of false arrest claims brought under New York state law. *Jenkins* v. *City of N.Y.*, 478 F.3d 76, 88 (2d Cir. 2007).

Arguable probable cause is an objective standard. It "exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Garcia* v. *Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Zalaski*, 723 F.3d at 390). "[W]hether an officer's conduct was objectively reasonable" depends on "the information possessed by the officer at the time of the arrest," not "the subjective intent, motives, or beliefs of the officer." *Id.* (quoting *Amore* v. *Novarro*, 624 F.3d 522, 536 (2d Cir. 2010)). "Put another way, an arresting officer will find protection under the defense of qualified

immunity unless 'no reasonably competent officer' could have concluded, based on the facts known at the time of arrest, that probable cause existed." *Figueroa*, 825 F.3d at 100 (citing *Malley* v. *Briggs*, 475 U.S. at 341). "Therefore, in situations where an officer may have reasonably but mistakenly concluded that probable cause existed, the officer is nonetheless entitled to qualified immunity." *Caldarola* v. *Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002).

### b. Summary Judgment Is Granted as to Sergeant Cruz and Officers Guzman and Regan

Defendants have not moved for summary judgment on Plaintiff's false arrest claim against Officers Acosta and Rivas, and that claim will proceed to trial. And there is no dispute that Plaintiff was arrested by individuals acting under color of state law. Defendants move for summary judgment on three grounds: (i) Regan and Guzman were not personally involved in Plaintiff's arrest and cannot be held liable under § 1983 for any ensuing constitutional violation; (ii) Cruz had probable cause to arrest Plaintiff based on the facts available to him at the time; and (iii) Cruz acted reasonably and is entitled to qualified immunity. The Court addresses each argument in turn.

Defendants are correct that personal involvement is a prerequisite to individual liability under § 1983. *See Patterson* v. *Cty. of Oneida, N.Y.*, 375 F.3d 206, 229 (2d Cir. 2004). In this regard, Defendants contend that "Sgt. Cruz interacted with [P]laintiff without assistance from P.O. Guzman or P.O. Regan." (Def. 56.1 ¶ 44; *see also id.* at ¶¶ 60-61). The contention, however, is accurate only as to Defendant Regan. The record indicates that Regan did not interact with Plaintiff; instead, Regan stopped, searched, and arrested J.R., the

individual who was with Plaintiff at 2040 Amsterdam Avenue. (Lozar Decl., Ex. 12 (Regan Memo Book) ("Deft. [J.R.; criminal possession of marijuana]. I recovered 31 [clear plastic bags] of marijuana from his waist area in blk plastic bag. PO Guzman [arresting officer]."); Regan Dep. 33:17-34:5 ("I dealt with [J.R.]"); 35:7-10 ("Q: Did you have any interaction with Ernesto Rodriguez? A: No.")).

Plaintiff argues that "Regan was personally involved in Plaintiff's arrest as a member of the SNEU Catch Team working collectively to make apprehensions, that he aided in Plaintiff's arrest," and that the arrests of Plaintiff and J.R. took place "within feet of each other." (Pl. 56.1 Opp. ¶ 60). But he corroborates these claims with evidence of facts that are not in dispute, namely, that Regan was part of the SNEU team on patrol that day and that the two arrests happened in close proximity to one another. (*Id.*). Plaintiff's proffered evidence does not support his claim that Regan "aided in Plaintiff's arrest," nor does it explain how an individual standing "within feet" of an alleged constitutional violation is involved in it.

Courts have rejected the notion that every member of a team of officers is, by default, personally involved in every arrest effected by the team. *See, e.g.*, *Minter* v. *Cty. of Westchester*, No. 08 Civ. 7726 (WHP), 2011 WL 856269, at *7 (S.D.N.Y. Jan. 20, 2011) (dismissing false arrest claim against SWAT team members for whom the plaintiff proffered no evidence of their participation in arrest) (citing *Howard* v. *Schoberle*, 907 F. Supp. 671, 682 (S.D.N.Y. 1995); *Howard*, 907 F. Supp. at 682 (holding that "[defendant's] presence on the

search team, standing alone, is an insufficient basis on which to find that she personally participated in the allegedly unconstitutional arrests"); *Munoz* v. *City of N.Y.*, No. 04 Civ. 1105 (JGK), 2008 WL 464236, at *5 (S.D.N.Y. Feb. 20, 2008) (holding that officers who were merely present at the place of arrest were not personally involved). There is no evidence in the record that Regan identified Plaintiff; ordered his arrest; assisted others in his arrest; touched, searched, or spoke to Plaintiff; processed any of his arrest paperwork; or had any involvement whatsoever in — beyond physical proximity to — Plaintiff's arrest. No reasonable juror could find that Regan was personally involved in Plaintiff's false arrest; summary judgment is therefore warranted. *Cf. Case* v. *City of N.Y.*, 233 F. Supp. 3d 372, 397 (S.D.N.Y. 2017) (holding that officers who processed arrest paperwork or "ordered, directed, and/or otherwise supervised" arrest directly participated in it).

There is, by contrast, sufficient evidence to raise a triable issue of fact as to Defendant Guzman's personal involvement. Though Defendant Acosta is listed as the arresting officer on Plaintiff's formal arrest report (Lozar Decl., Ex. 27), Guzman was initially listed as Plaintiff's arresting officer on the Prisoner Pedigree Card (*id.* at Ex. 24; *but cf. id.* at Ex. 12 (entry in Regan memo book listing "PO Guzman" as arresting officer of J.R.)). Guzman is also listed as the "finder" of evidence — a cell phone and a battery — seized from Plaintiff at the time of his arrest. (*Id.* at Ex. 28). It is for a jury to decide if these facts give rise to personal involvement sufficient for liability to attach under § 1983.

*See Williams* v. *Smith*, 781 F.2d 319, 323 (2d Cir. 1986) (personal involvement is a question of fact for the jury).

Having found a triable issue as to Guzman's personal involvement in Plaintiff's arrest, the Court proceeds to consider Defendants' remaining bases for summary judgment, i.e., whether Cruz and Guzman acted with probable cause and, if not, whether they are entitled to qualified immunity. An officer has probable cause to arrest when he has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Savino* v. *City of N.Y.*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Martinez* v. *Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000)). By Defendants' telling, on May 23, 2013, the SNEU catch team, including Cruz and Guzman, was informed by the SNEU observation team that there were two men walking south on St. Nicholas Avenue, one of whom (Plaintiff) was wanted in connection with an open complaint for a recent drug transaction. (Def. 56.1 ¶¶ 36-41). Defendants state that Cruz and Guzman arrested Plaintiff based on this information. (*Id.*). Plaintiff disputes that he was the person seen by the observation team on May 9, 2013, or that the complaint for the May 9, 2013 transaction was open as of May 23, 2013. (Pl. 56.1 Opp. ¶¶ 25, 36-41).

The relevant question here is not whether Plaintiff was, in fact, involved in the alleged May 9, 2013 transaction or whether a complaint was actually open for his arrest, but, rather, whether Plaintiff has identified a genuine dispute of fact as to whether Cruz and Guzman were told these things and

consequently arrested Plaintiff based on them.  Defendants correctly argue that police officers are entitled to rely on information they receive from fellow officers to effect a lawful arrest.  (Def. Br. 12 (citing *United States* v. *Colon*, 250 F.3d 130, 135 (2d Cir. 2001))).  *See also Colon*, 250 F.3d at 135 ("Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause ... but sufficient information to justify the arrest ... was known by other law enforcement officials initiating or involved with the investigation.").  Cruz and Guzman both testified at their depositions that the observation team told them that the individual later identified as Plaintiff was wanted in connection with an earlier drug sale.  (Cruz Dep. 46:2-5 ("Officer Acosta went over the radio and indicated that he's observing an individual that he observed a couple of days ago involving a hand-to-hand as a seller."); *id.* at 46:9-49:18; Guzman Dep. 27:2-3 ("[The observation team said that] there was an open Complaint for Mr. Ernesto's arrest for the sale of narcotics.")).

Plaintiff argues that the Officers concocted this story as a post-hoc justification for falsely arresting Plaintiff simply because he was walking with J.R., an individual who Plaintiff acknowledges was found to be in possession of marijuana.  (Pl. 56.1 Opp. ¶ 36).  To support his theory, Plaintiff cites to four pieces of evidence: (i) Cruz's testimony before the Civilian Complaint Review Board ("CCRB") regarding the information relayed by the catch team on May 23, 2013; (ii) Plaintiff's prisoner pedigree card, which lists the offense of

arrest as "CSM," or criminal sale of marijuana; (iii) the 33rd Precinct command log, which contains a similar notation; and (iv) Cruz's and Regan's testimony before the CCRB regarding the arrest of the individual known as J.R. Considered individually or in tandem, these four pieces of evidence are insufficient to raise a triable dispute of fact.

Plaintiff first claims that "Cruz testified to [Civilian Complaint Review Board ("CCRB")] that Acosta radioed to [Cruz, Guzman, and Regan] that he had observed JR involved in a drug transaction." (Pl. 56.1 Opp. ¶ 36). In point of fact, the statement is correct. (Lozar Decl., Ex. 10 at 6:25-7:9, 11:20-14:3). However, it wholly ignores the subsequent pages of testimony, in which Cruz states that after Acosta initially saw J.R. engage in a hand-to-hand on May 23, 2013, Acosta subsequently radioed to the catch team that the alleged buyer from the hand-to-hand (J.R.) was now walking with an individual who was the subject of an open complaint for a prior drug transaction (Plaintiff). (*Id.* at 7:10-21:17). The Court similarly disposes of Plaintiff's claim that "Cruz and Regan testified at CCRB that Acosta did not say that Plaintiff was involved in the alleged JR incident." (Pl. 56.1 Opp. ¶ 36). This statement is also correct, but it has no bearing on whether Acosta *also* told the catch team that he recognized Plaintiff has having been involved in an earlier incident that was the subject of an open complaint, as Cruz and Guzman testified.

That leaves Plaintiff's prisoner pedigree card and the precinct command log. Both are records of Plaintiff's arrest and both contain entries that list "CSM" (criminal sale of marijuana) as the crime of arrest. The pedigree card

shows "Guzman" on the line for "Arresting Officer," but this is crossed out and replaced with "Acosta"; and it shows "C.S.M." on the line for "Primary Charge," but this is crossed out and replaced with "CSCS (OPEN 61)." (Lozar Decl., Ex. 24). The precinct command log entry for May 23, 2013, lists Plaintiff's name, "Acosta" as the arresting officer, and "CSM" as the charge. (*Id.* at Ex. 23). Cruz testified at his deposition that he fills out the command log entries from the pedigree cards and that this command log entry is wrong and should say "criminal sale of controlled substance." (Cruz Dep. 69:15-72:24). Neither Acosta nor Guzman was asked about the pedigree card during their respective depositions.

As noted, the relevant inquiry here is whether there is a genuine dispute that Cruz and Guzman were told to apprehend Plaintiff because he was wanted in connection with a prior drug sale. The pedigree card and command log records do conflict with the later arrest records that show Plaintiff was arrested and charged with criminal sale of a controlled substance. But they do little, if anything, to show the existence of a genuine dispute as to what Cruz and Guzman were told in the radio transmission from the observation team. Cruz and Guzman both testified that they were told by the observation team that Plaintiff was involved in a prior narcotics transaction. Plaintiff relies solely on his deposition for his denial that he was involved in the May 9, 2013 narcotics transaction. (Pl. Dep. 105:18-106:7, 107:23-108:8). Even crediting that testimony, it does not detract from what Cruz and Guzman consistently testified they were told over the radio. For this reason, the Court finds no

22

genuine dispute that Cruz and Guzman were instructed by the observation team to apprehend Plaintiff based on an open complaint for his arrest. Thus, the Court finds no genuine dispute that Cruz and Guzman acted with probable cause to effect a lawful arrest — or, at the very least, that they acted with arguable probable cause sufficient to warrant a finding of qualified immunity. Summary judgment is therefore granted as to these two Defendants.

### 2.    Malicious Prosecution

#### a.    Applicable Law

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law[.]" *Manganiello* v. *City of N.Y.*, 612 F.3d 149, 160-61 (2d Cir. 2010) (citations omitted. Under New York law, a plaintiff must establish "[i] the initiation or continuation of a criminal proceeding against plaintiff; [ii] termination of the proceeding in plaintiff's favor; [iii] lack of probable cause for commencing the proceeding; and [iv] actual malice as a motivation for defendant's actions." *Id.* (internal quotation marks and citation omitted). Here as well, probable cause is a complete defense, though "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." *Minott* v. *Duffy*, No. 11 Civ. 1217 (KPF), 2014 WL 1386583, at *15 (S.D.N.Y. April 8, 2014). A defendant must show he had probable cause to believe that the charged individual could be successfully prosecuted. *Id.*; *see also Jones* v. *Meehan*, No. 14 Civ. 6402 (KPF), 2018 WL

23

459662, at *12 (S.D.N.Y. Jan. 16, 2018). "[A] lack of probable cause generally creates an inference of malice." *Manganiello*, 612 F.3d at 163.

While charges are brought by prosecutors, a police officer can be said to have initiated a criminal proceeding "by filing charges or other accusatory instruments," *Minott*, 2014 WL 1386583, at *15 (quoting *Cameron* v. *City of N.Y.*, 598 F.3d 50, 63 (2d Cir. 2010)), or where the "officer is found to play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act," *Bermudez* v. *City of N.Y.*, 790 F.3d 368, 377 (2d Cir. 2015) (internal quotation marks and citation omitted). The presumption under New York law is that a prosecutor exercises independent judgment. *Minott*, 2014 WL 1386583, at *16.

A prosecution that does not end in an acquittal is nonetheless "deemed to have ended in favor of the accused, for [malicious prosecution] purposes, only when its final disposition is such as to indicate the innocence of the accused." *Murphy* v. *Lynn*, 118 F.3d 938, 948 (2d Cir. 1997). "The answer to whether the termination is indicative of innocence depends on the nature and circumstances of the termination; the dispositive inquiry is whether the failure to proceed 'impl[ies] a lack of reasonable grounds for prosecution.'" *Id.* (quoting *Loeb* v. *Teitelbaum*, 432 N.Y.S.2d 487, 494 (2d Dep't 1980)). A dismissal of charges can be a favorable termination where "the dismissal represents the formal abandonment of the proceedings by the public prosecutor." *Russell* v. *The Journal News*, 672 F. App'x 76, 79 (2d Cir. 2016) (summary order) (quoting *Smith-Hunter* v. *Harvey*, 95 N.Y.2d 191, 198 (2000)). In general, the question of

whether a termination was favorable to the accused is a matter of law for the court, but where questions remain as to the reason for the termination, this becomes an issue of fact for the jury. *Murphy*, 118 F.3d at 950.

### b. Summary Judgment Is Granted as to Officer Rivas, But Denied as to Officer Acosta

Defendants Acosta and Rivas argue that Plaintiff cannot establish a triable issue as to the first and second elements. Specifically, they contend that police officers cannot be said to have initiated proceedings where the prosecutor exercises his or her independent judgment to bring charges, and that a prosecutor's motion to dismiss charges does not amount to a termination in the defendant's favor. (Def. Br. 15-16).

The first argument succeeds, but only as to Defendant Rivas. The parties agree that Defendant Acosta was the arresting officer named on Plaintiff's arrest record and Acosta generated that record. (Pl. 56.1 Opp. ¶¶ 49-50). The parties further agree that Acosta signed the criminal complaint charging Plaintiff with criminal sale of a controlled substance in the third degree. (*Id.* at ¶¶ 52-54; Lozar Decl., Ex. 30). A reasonable jury could conclude that Acosta initiated proceedings against Plaintiff when he provided the crucial information the DANY needed to file a criminal complaint, even if some of that information was obtained from his fellow officers. *See Minott*, 2014 WL 1386583, at *16 ("[I]t is well-established that a criminal complaint filed by a police officer can serve as the initiating act for malicious prosecution purposes." (citing *Cameron*, 598 F.3d at 63)). By contrast, there is nothing in the record to show that Rivas processed Plaintiff's arrest paperwork or had any

interaction with the DANY.  There is, thus, no basis for a reasonable jury to conclude that Rivas initiated the criminal proceeding against Plaintiff.

Acosta's second basis for summary judgment as to the malicious prosecution claim likewise fails.  *First*, the record is devoid of any evidence explaining why the DANY abandoned the case against Plaintiff.  On June 14, 2013, the DANY moved to dismiss the case.  This is memorialized on a Record of Court Action sheet by an impression from a rubber stamp that reads "DISMISSED MOTION A.D.A." (Lozar Decl., Ex. 31).  The City Criminal Court's disposition sheet offers no further information.  (*Id.*).  Without any indication of why prosecutors dismissed Plaintiff's case, the Court cannot resolve the issue of favorable termination in either side's favor.  This question must be put to a jury.

*Second*, even were the Court to find that Plaintiff has made out all the elements of a malicious prosecution claim, the Court cannot determine on summary judgment whether Acosta can marshal a probable cause defense. There remains a triable issue of fact as to whether Acosta had probable cause to order Plaintiff's arrest by the catch team.  The parties have a genuine dispute as to who, if anyone, identified Plaintiff on May 9, 2013; whether that person had the physical ability to identify accurately Plaintiff from their observation post atop a 15-story building, and whether they accurately identified Plaintiff again on May 23, 2013.  (Pl. 56.1 Opp. ¶¶ 1-13, 26, 30-40). And without documentary evidence that memorializes what Acosta saw on May 9, 2013, the probable cause question rests largely on a resolution of the

conflict between the Officers' and Plaintiff's testimony. The Court will leave for the jury to decide whose testimony should be believed.

And given the Court's inability to resolve as a matter of law the parties' disputes as to Acosta's *conduct*, it cannot find as a matter of law that Acosta is entitled to a qualified immunity defense. On this record, a reasonable jury could credit Plaintiff's telling of the May 2013 events and find that Acosta acted unreasonably. In sum, the Court cannot find, as a matter of law, that Acosta initiated criminal proceedings against Plaintiff with malice but, likewise, cannot find that he is free from liability. *Minott*, 2014 WL 1386583, at *19.

### 3. Fabrication of Evidence and Denial of a Fair Trial

#### a. Applicable Law

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti* v. *N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). To prevail, a plaintiff must establish that the "[i] investigating official [ii] fabricate[d] evidence [iii] that [was] likely to influence a jury's decision, [iv] forward[ed] that information to prosecutors, and [v] the plaintiff suffer[ed] a deprivation of liberty as a result. *Soomro* v. *City of N.Y.*, 174 F. Supp. 3d 806, 815 (S.D.N.Y. 2016) (quoting *Jovanovic* v. *City of N.Y.*, 486 F. App'x 149, 152 (2d Cir. 2012) (summary order)). It is of no matter that a plaintiff's case is never put before a grand or trial jury — this claim may be sustained where

27

charges are dismissed before trial.  *See Ricciuti*, 124 F.3d at 130 (reversing summary judgment on denial of fair trial claim for charges dismissed before trial).

### b.    Summary Judgment Is Granted as to Officer Rivas, But Denied as to Officer Acosta

Plaintiff alleges that Defendants "fabricated evidence … knowing that the evidence in question would likely influence a grand jury and trial jury … [thereby] corrupt[ing] [Plaintiff's] fair trial rights as guaranteed by 42 U.S.C. § 1983." (Am. Compl. ¶ 70; *see also, e.g.*, Pl. Opp. 1).  Defendants argue that Defendant Rivas was not personally involved in Plaintiff's prosecution and cannot be liable on this claim.  (Def. Br. 18-20).  For the reasons stated in the discussion of Plaintiff's malicious prosecution claim *supra*, the Court agrees and grants summary judgment in favor of Rivas on this claim.

A different result obtains for Defendant Acosta.  Defendants argue that "[P]laintiff's self-serving denial of his participation in the observed events of May 9, 2013, does not render the observations set forth in the criminal complaint false as a matter of law." (Def. Br. 19).  That may be true, but so is the converse:  Defendants' accounts of the events of May 9, 2013, fail to render the details in the criminal complaint true as a matter of law.  *See Gadsden* v. *City of N.Y.*, No. 14 Civ. 6687 (RJD), 2017 WL 5178439, at *5 (E.D.N.Y. Sept. 15, 2017) (denying summary judgment on fair trial claim where plaintiff disclaimed involvement in alleged crime and alleged that police fabricated evidence against him).  Plaintiff brings this claim based on the same

statements as those underpinning his malicious prosecution claim. Where the Court has denied summary judgment as to that claim because of material disputes concerning the events of May 9, 2013, it must also deny summary judgment as to Plaintiff's denial of a fair trial claim. *See Brandon* v. *City of N.Y.*, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010) ("[Because] a question of fact exists as to whether [officer] had probable cause to arrest [the plaintiff], Defendants' motion for summary judgment dismissing [the plaintiff's] fair trial claim is denied.").

Defendants' argument that Acosta could not have denied Plaintiff's right to a fair trial because the statements Acosta made to the DANY were inadmissible hearsay is unavailing. As Judge Swain recently held, citing this Court's analysis in *Rucks* v. *City of New York*, 96 F. Supp. 3d 138 (S.D.N.Y. 2015), "the fact that allegedly fabricated evidence would be inadmissible at trial by itself is not a bar to the claim [for denial of a fair trial]." *Soomro*, 174 F. Supp. 3d at 816 (citing *Rucks*, 96 F. Supp. 3d at 148). This point requires a brief discussion of the interplay here between § 1983 and testimonial immunity.

A plaintiff may not sustain a denial of a fair trial claim on the basis of grand jury or trial testimony — including the "immediate preparation for such proceedings" — as those statements are protected by absolute immunity. *Rucks*, 96 F. Supp. 3d at 148. The Second Circuit, in *Coggins* v. *Buonora*, 776 F.3d 108 (2d Cir. 2015), clarified that absolute immunity protection "does not extend to false statements made to a prosecutor consistent with, but

independent of, grand jury testimony," *Rucks*, 96 F. Supp. at 149, and held that courts considering a denial of a fair trial claim "should determine whether the plaintiff can make out the elements of his § 1983 claim without resorting to the grand jury testimony," *Coggins*, 776 F.3d at 113. This is consistent with the Circuit's prior holding in *Ricciuti* that a denial of fair trial claim can be sustained to remedy the liberty deprivation occasioned by pre-trial detention even where the case does not go to trial. *See Ricciuti*, 124 F.3d at 130. As this Court explained in *Rucks*, accepting Defendants' argument that this claim fails if based on inadmissible hearsay "would ensure that a denial of a fair trial claim based upon a fabricated narrative could never successfully navigate the Scylla and Charybdis of admissibility and immunity, thus restricting the cause of action to fabricated physical evidence or confessions." *Rucks*, 96 F. Supp. 3d at 149-50.

Put differently, imposing an admissibility requirement would limit the denial of fair trial claim to immunized statements, thereby gutting relief for those deprived of their liberty based on statements made to a prosecutor before trial. The inquiry on the materiality element of this claim is not whether the information *could* reach a jury but, rather, "whether 'the information would likely influence the jury *if* it arrived at a jury' in non-immunized fashion." *Soomro*, 174 F. Supp. 3d at 816 (quoting *Garnett* v. *Undercover Officer C0039*, 13 Civ. 7083 (GHW), 2015 WL 1539044, at *8 (S.D.N.Y. Apr. 6, 2015)).[6]

---

[6] The cases Defendants cite are not binding and the Court declines to follow them. (*See* Def. Br. 19-20). *See Bertuglia* v. *City of N.Y.*, 133 F. Supp. 3d 608, 639 (S.D.N.Y. 2015) (holding that statements could not form basis of denial of fair trial claim where they

The specific harm for which Plaintiff seeks relief is his post-arrest, pre-trial detention. *See Rohman* v. *N.Y.C. Transit Auth.*, 215 F.3d 208, 215-16 (2d Cir. 2000) (finding that the plaintiff sufficiently demonstrated a deprivation of liberty where he was required to make multiple appearances and, despite being released on his own recognizance, was required to "render himself at all times amenable to the orders and processes of the court"). The statements Plaintiff's alleges to have been fabricated never reached any jury, but Plaintiff's claim does not fail on that basis. Because material disputes of fact remain as to what statements were in fact communicated to the DANY, a jury must decide whether any statements communicated to the DANY were fabricated; whether any such statements were likely to influence a criminal grand or petit jury if put before one; and whether such statements caused the deprivation of Plaintiff's liberty. And because the Court finds that a reasonable jury could accept Plaintiff's account and find that Acosta invented this evidence *post hoc*, Acosta is not entitled to qualified immunity on this claim.

---

were (i) never made to a grand jury, (ii) hearsay, and (iii) true); *Jones* v. *City of N.Y.*, No. 12 Civ. 3658 (JG), 2013 WL 6047567, at *10 (E.D.N.Y. 2013) (holding that statement to prosecutor was hearsay and could not reach a jury). *Bertuglia* and *Jones* both appear to conflate the materiality and causation elements. Instead of asking if the statements are likely to influence a jury if presented to one (that is, material), these cases ask whether the statements would get to a jury and thus cause a deprivation of liberty (causation). *See Soomro*, 174 F. Supp. 3d at 815-16 ("Defendants' argument ... conflates the materiality (likely to influence a jury) and causation (consequential deprivation of liberty) elements of a denial of fair trial claim."). For the reasons explained above, that is not the relevant inquiry.

### 4. Failure to Intervene

#### a. Applicable Law

Law enforcement officers have an affirmative duty to intervene to prevent their fellow officers from infringing on a citizen's constitutional rights. *Guerrero* v. *City of N.Y.*, No. 16 Civ. 516 (JPO), 2017 WL 2271467, at *3 (S.D.N.Y. May 23, 2017). An officer can be liable under § 1983 where "[i] the officer had a realistic opportunity to intervene and prevent the harm; [ii] a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and [iii] the officer does not take reasonable steps to intervene." *Id.*

#### b. Summary Judgment Is Granted as to Defendants Cruz, Guzman, and Regan

The Amended Complaint recites a failure to intervene claim against "the Individual Defendants who failed to intervene" (Am. Compl. ¶ 74), and Plaintiff later clarified that the Defendants to which he refers are Cruz, Guzman, and Regan (Dkt. #78). In this regard, the Court understands Plaintiff to allege that Cruz, Guzman, and Regan failed to intervene in Acosta's and Rivas's alleged false arrest, malicious prosecution, and deprivation of fair trial offenses. (*See* Dkt. #78; Pl. Opp. 14-20).

The Court has found no genuine dispute of fact that the catch team arrested Plaintiff as a result of information communicated by the observation team. There is nothing in the record to suggest that any member of the catch team understood the information they received to be false, or even untrustworthy. And while Plaintiff contests his involvement in any narcotics

offenses, he cannot effectively controvert the facts regarding the catch team's knowledge and conduct. Cruz, Guzman, and Regan had no reason to believe that Plaintiff's constitutional rights were being violated. Summary judgment is therefore granted as to Plaintiff's claim of failure to intervene to prevent his false arrest.

Summary judgment is granted as well on Plaintiff's claim that Cruz, Guzman, and Regan failed to intervene in Acosta's malicious prosecution or denial of a fair trial. Acosta was the only officer involved in making statements to prosecutors, and there is no basis in the record for a reasonable jury to find that Cruz, Guzman, or Regan had a realistic opportunity to intervene in the initiation of criminal proceedings against Plaintiff or in the statements made to the DANY.

## C. The City's Motion for Summary Judgment Is Granted

### 1. Plaintiff's Claims of Deficient SNEU Training and Guidance

In addition to his claims against the individual Officers, Plaintiff also advances a *Monell* claim against the City for "failure to train" and "failure to supervise." In support of this claim, Plaintiff alleges that the NYPD failed to train officers on SNEU teams and did not advise them of new SNEU guidance that was issued in 2012 following the highly-publicized death of Ramarley Graham. (Pl. 56.1 Opp. ¶¶ 73-84). During their depositions, Plaintiff asked Defendants about their SNEU training; he now contends that Acosta, Guzman, Regan, and Rivas either did not recall their training or were unfamiliar with the SNEU manual. (*Id.* at ¶¶ 68-94).

Acosta testified that he received SNEU training sometime between 2010 and 2012, that it spanned several "days," and that he was trained to "[i]dentify different narcotics" and conduct chemical tests. (Acosta Dep. 14:12-16:23). Acosta was not aware of the existence of a SNEU manual. (*Id.* at 142:22-25). Guzman similarly testified that he learned how to identify narcotics, including the packaging of different drugs, and how to interpret the behavior of individuals involved in street sales of narcotics. (Guzman Dep. 15:3-19:6). He believes he received SNEU training between 2004 and 2008. (*Id.* at 19:2-6).

Regan testified that he received SNEU training but could not recall when. (Regan Dep. 13:19-25). He did recall that his SNEU training focused on how to "identify different packages of drugs" and conduct field tests, but testified that he had never seen a SNEU manual. (*Id.* at 13:16-14:12; 15:18-17:21). Rivas was also unable to recall seeing a SNEU manual but did recall that he had received SNEU training. (Rivas Dep. 60:12-24). Finally, Cruz testified that he recalled his SNEU training, even though it was a "while ago," and that it involved "a lot of lectures in regards to narcotics operations, and also law, and identifying narcotics, the proper way of vouchering narcotics, [and] identifying … narcotics locations." (Cruz Dep. 15:25-16:7). He remembered receiving "written material … like a manual guide." (*Id.* at 16:8-19).

Plaintiff makes much of the fact that the City was unable to locate and produce a copy of the SNEU manual that was in effect in May 2013. (Pl. 56.1 Opp. ¶ 79). He declaims the City's inability to produce copies of the SNEU Daily Activity Worksheet and SNEU Observation Reports for May 9 and 23,

2013 — or even exemplars of these forms — even though such paperwork is required by the NYPD SNEU manual. (*Id.* at ¶¶ 85-91). Somewhat relatedly, Plaintiff observes that the SNEU manual only permitted overtime work "as operations required," and that supervisors were ordered to "scrutinize" overtime requests and "investigate the circumstance present when arrests are routinely made late in the tour." (*Id.* at ¶ 95). Reviewing the time entries in Cruz's, Guzman's, and Acosta's memo books, Plaintiff alleges that these three officers worked overtime on May 9, 2013, after arresting eight individuals in the last two hours of their tour. (*Id.* at ¶¶ 97-98).[7]

### 2.    Applicable Law

Plaintiff sues the City for the deprivation of his constitutional rights pursuant to a municipal policy, custom, or practice, and alleges a systematic failure to adequately train police officers. To establish a municipal policy or custom sufficient to hold the City liable for these alleged violations,

> [A] plaintiff must allege that: [i] a particular municipal action *itself* violates federal law, or directs an employee to do so, [ii] an authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right, [iii] unconstitutional practices are so persistent and widespread as to practically have the force of law, or [iv] a municipality's failure to train its employees about their legal duty to avoid violating citizen's rights amounts to deliberate indifference.

---

[7]    Plaintiff adduces no evidence that these Defendants actually sought or were paid overtime wages in connection with the extra hours that he alleges they worked, nor did Plaintiff inquire about these instances at any depositions.

*Case*, 233 F. Supp. 3d at 403 (internal quotation marks and citations omitted).

Plaintiff must also demonstrate a causal link between the policy and the

alleged deprivation.  *Id.*; *see generally Monell*, 436 U.S. at 694-95.

Courts have been skeptical of municipal liability claims predicated on an

alleged failure to train, with the Supreme Court admonishing lower courts that

"[a] municipality's culpability for a deprivation of rights is at its most tenuous

where a claim turns on a failure to train."  *Connick* v. *Thompson*, 563 U.S. 51,

61 (2011).  A municipality may nonetheless be deliberately indifferent, and

thus liable, where "city policymakers are on actual or constructive notice that a

particular omission in their training program causes city employees to violate

citizens' constitutional rights[.]"  *Id.*  For example, a municipality can be said to

have acted with deliberate indifference where

> [i] a policymaker knows 'to a moral certainty' that city
> employees will confront a particular situation; [ii] the
> situation either presents the employee with a difficult
> choice of the sort that training or supervision will make
> less difficult or there is a history of employees
> mishandling the situation; and [iii] the wrong choice by
> the city employee will frequently cause the deprivation
> of a citizen's constitutional rights.

*Wray* v. *City of N.Y.*, 490 F.3d 189, 195-96 (2d Cir. 2007) (internal quotation

marks and citation omitted).  Put differently, deliberate indifference manifests

as a "conscious disregard of the risk that poorly-trained employees will cause

deprivations of clearly established constitutional rights."  *Id.* at 196.

In *Connick*, the Supreme Court observed that "[a] pattern of similar

constitutional violations by untrained employees is 'ordinarily necessary' to

demonstrate deliberate indifference for purposes of failure to train." 563 U.S. at 62 (citing *Bd. of Cty. Comm'rs of Bryan Cty.* v. *Brown*, 520 U.S. 397, 403 (1997)). Accordingly, the Court held that a single violation did not give rise to municipal liability under § 1983 for a failure to train. *Id.* at 54 ("We granted certiorari to decide whether a district attorney's office may be held liable under § 1983 for failure to train based on a single *Brady* violation. We hold it cannot.").

As the Second Circuit recently confirmed, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Barrett* v. *City of Newburgh*, — F. App'x —, 2017 WL 6540497, at *2 (2d Cir. Dec. 21, 2017) (summary order) (quoting *Segal* v. *City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006)).

### 3. Summary Judgment Is Granted as to Plaintiff's *Monell* Claim

Plaintiff first alleges that his arrest was effectuated pursuant to a City and NYPD policy of:

> [A]rresting innocent persons in order to meet "productivity goals," or arrest quotas; arresting individuals for professional advancement, overtime compensation, and/or other objectives outside the ends of justice; and/or manufacturing false evidence against individuals in an individual effort and also in a conspiracy to justify their abuse of authority in falsely arresting, unlawfully stopping and maliciously prosecuting those individuals.

(Am. Compl. ¶ 80).  In support of this claim, Plaintiff proffers evidence that the

Officers had a "busy day" on May 9, 2013, and arrested a number of

individuals toward the end of their tour, causing them to work past their

scheduled end time.  (Pl. 56.1 Opp. ¶¶ 97-98).  The Court agrees with

Defendants that there is "no evidence that the officers or precinct involved in

[Plaintiff's] arrest were subject to an alleged quota or productivity goal system."

(Def. Br. 7).  There is similarly no evidence in the record that the Officers

structured their schedules to order to maximize the possibility of overtime

compensation, or rushed end-of-tour arrests in a manner that increased the

possibility of mistaken arrests.  There is, in consequence, no basis for a

reasonable juror to find for Plaintiff on a policy-based *Monell* claim, and

summary judgment is granted in favor of the City.[8]

Alternatively, Plaintiff advances a failure to train theory of municipal

liability.  As detailed above, Plaintiff's counsel asked each of the Officers during

their depositions about their training on SNEU procedures.  None of the

Officers recalled exactly when he received SNEU training, though they all

confirmed that they had attended SNEU training and recalled, generally, the

subjects covered.  (*See* Acosta Dep. 14:12-16:23; Guzman Dep. 15:3-19:6;

Regan Dep. 13:16-14:12; 15:18-17:21; Rivas Dep. 60:12-24; Cruz Dep. 15:25-

16:19).  Acosta, Guzman, and Rivas also confirmed that they had received

---

[8]     Near the end of his brief, Plaintiff intimates that the City's practices with respect to the
grant (and communication) of adjournments in contemplation of dismissal (or "ACDs")
could support a finding that his Fourth Amendment rights had been violated.  (*See* Pl.
Opp. 25-26). Given the absence of legal support for the argument, as well as the dearth
of factual support, the Court summarily rejects it.

periodic training on their patrol duties throughout their career at the NYPD. (*See* Acosta Dep. 9:22-10:5; Guzman Dep. 14:17-24; Rivas Dep. 104:23-105:9).

In opposing Defendants' motion, Plaintiff invokes the highly-publicized killing of Ramarley Graham, an incident that he claims evidences a pattern of faulty identifications and misperceptions by police officers; Plaintiff predicates a *Monell* claim on allegations that the Officers were not trained on a SNEU Interim Order that was issued by the NYPD shortly after Graham's tragic death. (Pl. Opp. 21-24). In other words, Plaintiff argues — and predicates his *Monell* claim in part on the argument — that even though the NYPD issued new guidance following the Graham incident, "the City never took appropriate action to implement it" as evidenced by, *inter alia*, the Officers' "near-total ignorance of the mandatory SNEU recordkeeping protocols[.]" (Pl. Opp. 24).

For example, Plaintiff notes that Defendants could not produce any SNEU Observation Reports for May 9, 2013, or May 23, 2013. (Pl. Opp. 24). Plaintiff explains that SNEU Observation Reports must be filled out "for each transaction (buyer/seller) that occurs on the set" and must contain "facts/details re: times, locations, observations and more in their memo books." (Pl. 56.1 Opp. ¶ 87 (internal quotation marks omitted)). Plaintiff also faults the Officers (and thus the City) for allegedly incomplete descriptions in their memo books. The memo books indicate that the Officers routinely recorded the times and locations of alleged narcotics transactions, as well as descriptions of the individuals involved or the specific circumstances of the transaction, but were neither perfectly consistent nor perfectly complete in all

cases.  (Lozar Decl., Ex. 11-15).  For example, Guzman — who was the officer of record for B.P., one of the alleged buyers in the May 9, 2013 transaction — recorded details of this transaction in his memo book.  (*Id.* at Ex. 13).  Guzman's entry indicates that Rivas observed a narcotics transaction on St. Nicholas Avenue between 162nd and 163rd Streets; Cruz recovered narcotics from the buyer at the scene and again at the precinct.  (*Id.*).  The memo book does not contain a description of the seller or the intermediary.

In point of fact, none of the Officers' May 9, 2013 memo book entries contains a description of an individual who matches Plaintiff's physical characteristics.  But the Officers' deviation from their obligation to record details about all participants in a transaction is not enough to establish that the City acted with deliberate indifference to the risk that police officers would misidentify the individuals they pursue.  *Jenkins*, 478 F.3d at 95 ("A training program is not inadequate merely because a few of its graduates deviate from what they were taught.").

To be sure, a reasonable juror could conclude that the Officers' vague memories of their SNEU training suggest that the training could be improved or offered more often.  But the record before the Court does not establish that Plaintiff was falsely arrested or maliciously prosecuted *because of* deliberate indifference on the part of the City to the risk of faulty identifications.  Without enough evidence to support a causal link between the NYPD's training program and the deprivations of Plaintiff's rights, a reasonable juror could not find for

Plaintiff on his *Monell* claim.  Accordingly, summary judgment is granted in favor of Defendants.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED on Plaintiff's false arrest claim against Sergeant Cruz and Officers Guzman and Regan; GRANTED on Plaintiff's malicious prosecution claim against Officer Rivas; DENIED on Plaintiff's malicious prosecution claim against Officer Acosta; GRANTED on Plaintiff's claims for fabrication of evidence and denial of fair trial against Officer Rivas; DENIED on Plaintiff's claims for fabrication of evidence and denial of a fair trial against Officer Acosta; and GRANTED on Plaintiff's failure to intervene claim against Sergeant Cruz and Officers Guzman and Regan.  Finally, summary judgment is GRANTED on Plaintiff's claim of municipal liability against the City of New York.

Accordingly, three claims remain in this action: a false arrest claim against Officers Acosta and Rivas; a malicious prosecution claim against Officer Acosta; and a denial of a fair trial claim against Officer Acosta.  The Clerk of Court is directed to terminate the motion at Docket Entry 74 and to terminate Defendant City of New York from the case.

It is hereby ORDERED that the parties appear for a conference to set a trial in this matter on **Tuesday, April 3, 2018, at 10:00 a.m.** in Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York, 10007.

SO ORDERED.

Dated:      March 5, 2018
            New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge